HONEYWELL INC. AND SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Honeywell, Inc. v. Commissioner
Docket No. 28766-89
United States Tax Court
T.C. Memo 1992-453; 1992 Tax Ct. Memo LEXIS 478; 64 T.C.M. (CCH) 437; August 11, 1992, Filed For Petitioner: Clinton A. Schroeder, Myron L. Frans, Dennis I. Meyer, C. David Swenson, Pamela M. Magadance, William L. Killion, and Robert J. McReavy. For Respondent: Christopher B. Sterner and Madlyn B. Coyne. COHEN
COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies of $ 36,329,771 and $ 13,850,028 in petitioner's Federal income tax for 1980 and 1981, respectively. The issue discussed in this opinion, which was separately tried and briefed, relates to petitioner's method of accounting for rotable parts as fixed assets subject to depreciation. We must determine: (1) Whether respondent abused her discretion in determining that petitioner was required to use the inventory method of accounting for rotable parts; (2) if not, whether respondent abused her discretion under section 7805(b) in refusing to grant to petitioner retroactive relief; and (3) whether petitioner is entitled to claim investment tax credit on rotable parts that it used to service customer-owned computers. (The parties agree that, if petitioner's method of accounting for its rotable parts was proper, it is entitled to the investment tax credit.) *479 Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. FINDINGS OF FACT Some of the facts have been stipulated and the stipulations of facts are incorporated herein by this reference. Honeywell Inc. (petitioner) was a Delaware corporation with its principal place of business in Minneapolis, Minnesota, at the time it filed the petition in this case. Petitioner was an accrual method taxpayer and used the calendar year as its taxable year. Petitioner timely filed with its domestic subsidiaries consolidated Federal income tax returns for 1980 and 1981. Petitioner's Computer Maintenance Service Business
Petitioner and its wholly owned subsidiary, Honeywell Information Systems, Inc. (HIS), were engaged in the business of maintaining and servicing computers that petitioner sold or leased to its customers. As part of its maintenance service business, petitioner entered into maintenance agreements with customers to whom it leased or sold computers. The typical maintenance agreement with a customer who owned its computer covered a 1-year period but was usually renewed as long as the customer owned the machine. Petitioner *480 required customers who leased their computers to pay for maintenance. Pursuant to the terms of the maintenance agreements, petitioner was obligated to provide labor and materials that were necessary to repair the computers. The fee that petitioner charged was set forth in its maintenance agreements as a fixed amount based upon the model of the computer and the hours of service availability. The fee was the same regardless of whether the customer leased or owned its computer. Petitioner's determination of the amount of the fixed fee to be charged for each of its computer models and related equipment was based upon various factors, including the cost of labor, the cost of training, petitioner's overhead cost, the failure rates of computers, the time required to fix computers, the cost of replacement parts, and the maintenance fees charged by petitioner's competitors. Except for labor charges for services performed beyond the principal period of maintenance, once it was determined, the fee did not change during the term of the maintenance agreement regardless of petitioner's actual cost to comply with the terms of the maintenance agreement. The number of replacement parts that *481 petitioner used to repair a specific computer did not affect the fee charged to the customer. Petitioner's Replacement Parts Pool
Petitioner's Field Engineering Division (FED) operated petitioner's computer maintenance service business. Petitioner's objective was to satisfy its customers' general expectation that their computers would perform their functions. Because the amount of time that a customer's computer was not functioning (downtime) could be extremely costly and disruptive, petitioner's ability to sell or lease its computers would have been severely damaged if it could not secure a fast repair and response time in its maintenance business. Petitioner's goal was to have its field engineers arrive at a customer's location within 2 hours after a maintenance service call was received and to have the malfunctioning computer repaired within 2 hours after the engineer's arrival. The FED therefore employed more than 24,000 field engineers at approximately 1,300 different locations throughout the United States. Petitioner also established and maintained a pool of replacement parts (replacement parts pool) that the field engineers used to repair petitioner's customers' *482 computers. In 1980 and 1981, the replacement parts pool contained more than 40,000 different types of parts. The replacement parts pool contained both expendable parts and rotable parts. An expendable part was a part that was not repaired when it malfunctioned. A rotable part was a part that was repaired when it malfunctioned and, after it was repaired, would function in the same manner as a new rotable part. Rotable parts in the replacement parts pool were available to service computers that were leased or sold to petitioner's customers. Petitioner established a parts handling system that was comprised of approximately 1,300 warehouses, cloisters, and select customers' sites where the parts were strategically located. Parts in petitioner's replacement parts pool were physically separated from the parts that were used in its manufacturing processes. Petitioner tracked the use of the rotable parts through a separate management system known as the Logistics Integrated Data System (LIDS). Petitioner monitored rotable parts in the replacement parts pool through a "closed loop" process that allowed petitioner to locate rotable parts in petitioner's system at a given time. Rotable *483 parts were not, however, tracked on an individual basis through LIDS. Petitioner was not able to determine either through its parts handling system or through LIDS whether a rotable part in the replacement parts pool was new or repaired. The use of repaired rotable parts in petitioner's replacement parts pool, rather than the exclusive use of new rotable parts, allowed petitioner to reduce its costs in its maintenance service business. Also, that rotable parts could be repaired and used again was a factor that was considered in determining the number of parts that was necessary when petitioner introduced a new computer into the market. When petitioner decided to stop manufacturing a computer, it determined whether additional parts should be added to the replacement parts pool to support those computers still in operation. Petitioner did not remove or scrap rotable parts from its pool until such parts clearly would not be needed. If petitioner determined that it would no longer provide maintenance support for a particular computer and determined that there were no such computers currently under a maintenance agreement, it would remove and scrap the rotable parts for that computer. *484 If petitioner determined that some of the parts were still under maintenance agreement but that the number of such computers was declining, it would maintain a projected lifetime supply of the rotable parts for such computers. Records that were used solely for purposes of managing petitioner's maintenance service business and not for tax or financial accounting purposes indicate that petitioner received approximately $ 1,400,000 from the scrapping of rotable parts in 1980. Use of Rotable Parts in Petitioner's Maintenance Service Business
Prior to leaving on a service call, a field engineer attempted to identify, locate, and obtain the group of parts from the replacement parts pool that the field engineer expected to use on the service call. When a field engineer removed a rotable part from the replacement parts pool, the rotable part was placed on an "owes list" where it remained until the field engineer returned that part or returned the part removed from the customer's computer. While on the service call, the field engineer attempted to determine whether a particular part was defective and needed to be replaced. The field engineer sometimes used parts from the replacement *485 parts pool as part of the diagnostic procedure to isolate the problem. The field engineer would replace with a part from the replacement parts pool a part in the computer that the field engineer suspected was malfunctioning. The field engineer had the discretion to remove and replace any number of parts with parts from the replacement parts pool until the computer was operational. Thus, some of the parts that were replaced were not defective. Unused parts and parts used only in diagnostic procedures were returned to the replacement parts pool as operational rotable parts after the service call. Pursuant to petitioner's maintenance agreements, petitioner installed the replacement parts on an exchange basis at no additional charge to its customers. Sometimes customers were not informed or aware that petitioner exchanged a part from the customer's computer with a part from petitioner's replacement parts pool. If the part that was removed from a customer's computer was replaced with an expendable part from the replacement parts pool, the field engineer discarded it. If the part that was removed was a rotable part, it was shipped to a warehouse for potential repair. If petitioner *486 had a sufficient quantity of that particular type of rotable part in its replacement parts pool, it stored that part until that type of part was needed.
Once it was determined that there was a need for a particular type of rotable part, the removed parts were tested to determine whether they were defective. Many of the parts that were removed were not tested. To the best of petitioner's knowledge, there was no market for the purchase or sale of rotable parts that petitioner removed from computers but which had never been tested or repaired. On the other hand, approximately 20 percent to 30 percent of the rotable parts that were tested were found not to be defective and were thus returned to the replacement parts pool. If a part was defective, a determination was made as to whether it was feasible and economical to repair it. If a part was not going to be repaired, it was stored until it was scrapped. If a part was repaired, it was placed with other operational rotable parts in the replacement parts pool. Repairs were generally performed at petitioner's manufacturing facility or at a repair facility located at one of petitioner's warehouses. Rotable parts that were manufactured *487 other than by petitioner would generally be delivered to that manufacturer for testing and repair. If the rotable part that was removed was tested and repaired, it was not put back into the customer's computer from which it was removed. That is, there was no second swap of rotable parts. Petitioner did not place such a part back into the computer because of the downtime and disruption to the customer's business. Thus, petitioner had title and possessed all incidents of ownership at all times to all of the replacement parts in its replacement parts pool. Petitioner's maintenance agreement customers who owned their computers held title to any parts in their computers. Parts in petitioner's replacement parts pool were sometimes available to customers who did not enter into maintenance agreements with petitioner. Those customers would contact petitioner's sales and contracts department, which would first attempt to obtain the part from the manufacturer. If the part could not be obtained from the manufacturer, that department contacted FED to determine if the part was available in the replacement parts pool. If available, and if the supply of that part in the pool exceeded the *488 level that petitioner required for its maintenance service business, the part was transferred at petitioner's cost to the sales and contracts department, which then sold the part to the customer. The sales and contracts department received revenue from repaired rotable parts, the lease of rotable parts, the sale of expendable parts, and the sale of rotable parts in the total amounts of $ 5,856,355 and $ 4,957,902 in 1980 and 1981, respectively. The total cost of rotable and expendable parts that were transferred from the replacement parts pool and sold by the sales and contracts department to customers who did not enter into maintenance contracts with petitioner was $ 600,000 and $ 300,000 in 1980 and 1981, respectively. On a very limited number of occasions, petitioner provided maintenance service to customers who had not entered into a maintenance contract with petitioner. In those cases (the so-called time and material service call), a part was taken from the replacement parts pool only if that part was in ready supply. Petitioner charged that customer for the labor and for the part. The amount charged was based on a price list maintained by petitioner. The customer was *489 not required to return to petitioner the part that was removed from the computer and, if it did, petitioner did not pay money or give credit to the customer for the return. Generally, parts used in warranty work on computers sold by petitioner also came from petitioner's replacement parts pool. Also, petitioner, on one occasion during 1980 and 1981, agreed to provide parts to one of its Federal Government customers. Petitioner's Accounting and Tax Treatment of Rotable Parts
Petitioner consistently used the fixed asset method of accounting for rotable parts for tax and financial accounting purposes since 1957, the first year that it used such parts. Under that method, the cost of a rotable part was capitalized and depreciated over the depreciable life assigned to the computer with which that part was associated. For financial accounting purposes, petitioner depreciated its rotable parts over a 5-year period. Petitioner's independent auditors opined that petitioner's annual financial statements for 1980 and 1981 were presented in accordance with generally accepted accounting principles (GAAP). Petitioner used a "net asset layer concept" for computing depreciation and the *490 investment tax credit each year. The total cost of parts removed from the pool during the year was subtracted from the total cost of parts added to the pool during that year to arrive at the net value added to the pool. That net increase was the basis upon which petitioner calculated the amount of depreciation and the investment tax credit. Although, for accounting purposes, petitioner recorded a number of additions to and removals from the replacement parts pool during each year, it did not account for transfers in and out of the replacement parts pool during that year. Rather, petitioner focused on the net increase and the cost of rotable parts added to the pool by the end of that year, and, when petitioner exchanged a rotable part from its replacement parts pool with a rotable part from a customer's computer, petitioner did not make any adjustment in its net asset layer calculation. The original costs of the net asset layers of rotable parts that were the basis upon which petitioner calculated the amount of depreciation and the investment tax credit, as reported on its Federal income tax returns for 1976 through 1981, were as follows: Year
Costs
1976
$ 20,037,658
1977
30,785,950
1978
27,075,856
1979
19,878,424
1980
33,090,648
1981
33,697,388
*491 For Federal income tax purposes, petitioner elected in 1976 to depreciate all new rotable parts under the Class Life Asset Depreciation Range System (CLADR), using the 7-year life. Petitioner established a vintage account each for its computers and for its rotable parts to calculate the amount of depreciation with respect to the net asset layer for each such year. In 1981, petitioner began depreciating rotable parts as 5-year property under the Accelerated Cost Recovery System (ACRS) but continued to use CLADR for rotable parts that it acquired or purchased prior to 1981. On its Federal income tax returns for 1980 and 1981, petitioner claimed depreciation expense for the rotable parts that it used to service computers that it sold and leased to its customers pursuant to maintenance agreements in the amounts of $ 21,146,712 and $ 20,959,946, respectively. The depreciation expense claimed for those years represented aggregate depreciation costs based on the current year's net asset layer and the previous years' vintage accounts. Petitioner claimed investment tax credit on its rotable parts for 1980 and 1981 in the amounts of $ 3,309,065 and $ 3,369,739, respectively. The parties *492 have agreed (for purposes of this litigation) that, during 1980 and 1981, 50 percent of petitioner's computer maintenance service business related to computers that were sold to customers and 50 percent of that business related to computers that petitioner leased to its customers. Petitioner incurred other expenses in its computer maintenance service business, including expenses for wages and benefits of service technicians and support personnel, marketing expenses, travel expenses, the cost of expendable parts, general administrative expenses, and repair expenses. Petitioner deducted as period costs the cost of repairing rotable parts that were removed from its customers' computers. As an accrual basis taxpayer, petitioner reported income from its maintenance agreements on a monthly basis over the period covered by the agreement. Petitioner's books reflect that it received revenue from maintenance agreements with customers who owned their computers in the amounts of $ 210,479,346 and $ 244,497,940 in 1980 and 1981, respectively. Records and summaries that were used solely for purposes of managing petitioner's maintenance service business and not for tax or financial accounting *493 purposes reflect that petitioner received revenue from its maintenance agreements with customers who leased computers from petitioner in the amounts of $ 60,600,000 and $ 63,500,000 in 1980 and 1981, respectively. Accounting and Tax Treatment of Rotable Parts in Computer Industry
The twelve leading companies in the computer maintenance service business generally used two different methods of accounting for rotable parts in their computer maintenance businesses that were used to service leased and customer-owned equipment: (a) A fixed asset method of accounting in which rotable parts were treated as capital assets and depreciated, or (b) an inventory method in which rotable parts were treated as nondepreciable inventory items. Seven of those companies used a fixed asset method of accounting, and the other five used an inventory method. Those methods were not necessarily the exact methods that were utilized by petitioner or advocated by respondent in this case. In 1976, respondent's Detroit district was assigned the responsibility for coordinating an industry-wide audit of the business machine industry, which included computer companies. The primary objective was to establish *494 and maintain a uniform position regarding industry issues where facts and circumstances demanded a uniform application of statutory law. In general, respondent's revenue agents and case managers who were assigned to examine the largest taxpayers in the business machine industry participated in the study. Each of the districts that participated in the industry-wide audit was asked to submit a list of technical issues concerning that industry. One of the six issues that was selected to be analyzed was whether rotable parts used in the repair and maintenance of computers should be treated as capital assets and depreciated on the same basis as the equipment to which they related. In April 1978, the group participants reached a consensus as to the facts, the law, and the argument for each of the six issues. "Issue papers" were prepared for each of the six issues and were incorporated into a document entitled "Final Report, Business Machine Industry-Wide Audit" (the Brown Report). The recommendation in the Brown Report was that rotable parts: should be capitalized and depreciated in the same manner as is spelled out in Revenue Rulings 69-200 and 69-201. The depreciable life used *495 should be based on facts and circumstances as to the useful life of the machinery and equipment to which they relate beginning at the time the machinery and equipment were placed in service. This procedure will be followed whether the machinery and equipment is leased or sold. In 1978, the Brown Report was transmitted to the examination division's regional office and copies were sent to all of the participants in the industry-wide audit. In 1979, respondent's examination division created the Industry Specialization Program (ISP). According to the Internal Revenue Manual then in effect, the ISP was created in part to provide for the identification and development of issues and to insure uniform and consistent treatment of issues within an industry. One of the designated industries was the computer industry. Thus, petitioner, in addition to being one of the taxpayers included in the industry-wide audit of the Brown Report, was also included in the ISP for the computer industry during 1980 and 1981. The first industry specialist, who had been assigned as the case manager on the audit of petitioner's Federal income tax returns for 1972 through 1975, was required to identify issues *496 to be coordinated in the computer industry. The six issues that were selected to be analyzed were those that had been analyzed in the Brown Report. The first set of proposed coordinated issue papers was forwarded to the National Industry Coordinator in Washington, D.C.
In or about 1979, it was the responsibility of the National Industry Coordinator to review and transmit to the Director, Corporate Tax Division (Technical), the issue papers with a memorandum requesting that those issues be reviewed and evaluated. The recommendations of Technical were to be incorporated into the issue papers by the industry specialist. The issues, as modified by Technical's recommendations, then became the official coordinated issues for the industry. As of April 22, 1981, those comments received from Technical were advisory and not binding on the examination division. During the years at issue, Technical was under the jurisdiction of respondent. In 1979 and 1980, there was no provision in the Internal Revenue Manual that defined the process to be followed by Technical in reviewing proposed coordinated issue papers submitted to it by the National Industry Coordinator. There were, however, two *497 informal review procedures that were established by the assistant branch chief of the Corporate Tax Division (Technical). The industry specialist sent all six proposed coordinated issue papers to the National Industry Coordinator and was informed that the six proposed coordinated issue papers had been approved as the official coordinated issues for the computer industry. In 1980, the industry specialist distributed six coordinated issue papers to the regional review staffs and to the various case managers and revenue agents in the computer industry. The industry specialist advised them that it was mandatory for the case managers and revenue agents to incorporate the coordinated issues into their audit plans and that the treatment accorded each issue was to be consistent with the conclusions reached in each issue paper. From 1980 through 1985, the ISP circulated issue papers throughout the industry. The ISP's issue papers that discussed the proper accounting treatment of rotable parts concluded that the parts should be capitalized and depreciated over the life of the computer with which the rotable parts were associated. The second industry specialist was also the case manager *498 assigned to examine petitioner's Federal income tax returns for 1978 through 1983. That industry specialist discussed with and provided to petitioner's representatives copies of the coordinated issue papers, including the paper on rotable parts, and informed petitioner that it was required to follow those papers. In or about 1980, petitioner's manager of Federal tax reporting and compliance obtained and read the Brown Report, as well as the revenue rulings cited therein. Acting on behalf of petitioner, the Federal tax manager relied upon the Brown Report and those revenue rulings to continue petitioner's long-standing practice of depreciating rotable parts in the manner described above. The Federal tax manager also met with several of respondent's employees periodically during the audit of petitioner's Federal income tax returns for 1980 and 1981 and was informed that petitioner was required to follow the ISP position on rotable parts and that it was required to depreciate such parts. Sometime in the fall of 1985, respondent's case manager and revenue agent informed petitioner that the ISP had changed its position on the treatment of rotable parts to require that such parts be *499 treated as inventory and that the case manager was required to propose as an adjustment the disallowance of petitioner's fixed asset method of accounting. Approximately 1 month prior to the time that the notice of deficiency in this case was issued and while petitioner's case was being reviewed in respondent's Appeals office, the Appeals officer requested that petitioner provide any and all substantiation that would establish the number and costs of the rotable parts that were in the replacement parts pool at the beginning and end of 1980 and 1981 or any other information that would enable respondent to compute petitioner's income using an inventory system for rotable parts. In the notice of deficiency, respondent determined that petitioner's rotable parts used to service customer-owned computers were required to be treated as inventory and disallowed depreciation and the investment tax credit that petitioner had claimed on its Federal income tax returns for 1980 and 1981 with respect to such rotable parts. Respondent proposed no adjustment to petitioner's fixed asset method of accounting with respect to its rotable parts that were used to service computers that petitioner leased *500 to its customers. Respondent proposes that petitioner adopt an inventory method of accounting for rotable parts in its replacement parts pool that petitioner used to service customer-owned computers. Petitioner would be required to write off the cost of a rotable part in its replacement parts pool when the part was actually exchanged with a rotable part from the customer's computer and to include in income the fair market value of the rotable part received, such value being equal to the cost of the rotable part less the estimated cost to repair it. OPINION We must first decide whether respondent's determination that petitioner was required to treat as inventory rotable parts in its replacement parts pool that were used to service customer-owned computers was an abuse of discretion. If not, we must determine whether there was an abuse of discretion under section 7805(b) in refusing to grant to petitioner retroactive relief to treat such parts as depreciable property. The first issue is governed by sections 446 and 471. Section 446(a) provides that "Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income *501 in keeping his books." Section 446(b), which is an exception to that general rule, provides that, "If no method of accounting has been regularly used by the taxpayer, or if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income." "No method of accounting is acceptable unless, in the opinion of the Commissioner, it clearly reflects income." Sec. 1.446-1(a)(2), Income Tax Regs.
Section 471(a) provides as follows: Whenever in the opinion of the Secretary the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income. Respondent has broad discretion in the application of these sections. In Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532-533 (1979), the Supreme Court explained: It is obvious that on their face, secs. 446 and 471, with their accompanying Regulations, vest the Commissioner *502 with wide discretion in determining whether a particular method of inventory accounting should be disallowed as not clearly reflective of income. This Court's cases confirm the breadth of this discretion. In construing sec. 446 and its predecessors, the Court has held that "the Commissioner has broad powers in determining whether accounting methods used by a taxpayer clearly reflect income." Commissioner v. Hansen, 360 U.S. 446, 467 (1959). Since the Commissioner has "much latitude for discretion," his interpretation of the statute's clear-reflection standard "should not be interfered with unless clearly unlawful." Lucas v. American Code Co., 280 U.S. 445, 449 (1930). * * * In construing * * * a predecessor of sec. 471, the Court held that the taxpayer bears a "heavy burden of [proof]," and that the Commissioner's disallowance of an inventory accounting method is not to be set aside unless shown to be "plainly arbitrary." Lucas v. Structural Steel Co., 281 U.S. 264, 271 (1930). Thus respondent possesses broad discretion to determine whether a particular method of accounting clearly reflects income and to require a *503 change to a method that, in respondent's opinion, does clearly reflect income. Capitol Federal Savings & Loan v. Commissioner, 96 T.C 204, 209 (1991). Whether the particular accounting method clearly reflects income is a question of fact. Coors v. Commissioner, 60 T.C. 368, 394 (1973), affd. sub nom. Adolph Coors Co. v. Commissioner, 519 F.2d 1280 (10th Cir. 1975). In general, a method of accounting clearly reflects income if it results in accurately reported taxable income under a recognized method of accounting. Wilkinson-Beane, Inc. v. Commissioner, 420 F.2d 352, 354 (1st Cir. 1970), affg. T.C. Memo. 1969-79. When a taxpayer demonstrates that the taxpayer's method of accounting does clearly reflect income, respondent cannot require that taxpayer to change to a different method even if, in respondent's view, respondent's method more clearly reflects income. Molsen v. Commissioner, 85 T.C. 485, 498 (1985). If the taxpayer's method of accounting is explicitly authorized by the Internal Revenue Code or by the regulations, respondent may not reject that method as *504 not providing a clear reflection of income if the taxpayer has applied that method on a consistent basis. Hallmark Cards, Inc. v. Commissioner, 90 T.C. 26, 31 (1988). Also, if that method of accounting reflects a consistent application of generally accepted accounting principles, it will ordinarily be regarded as clearly reflecting income. Hallmark Cards, Inc. v. Commissioner, 90 T.C. at 31; sec. 1.446-1(a)(2), Income Tax Regs. But see Thor Power Tool Co. v. Commissioner, supra at 539-540. The Parties' Positions
Petitioner's position is that it was engaged "in the business of selling services, not parts" and that its replacement parts pool, which consisted of rotable parts that petitioner used to service customer-owned computers or computers that it leased to its customers, was an asset that petitioner "used in its maintenance business and qualified as depreciable property under section 167." Petitioner contends that its fixed asset method of accounting for rotable parts used in its computer maintenance service business clearly reflected income because it accurately matched revenue from its maintenance agreements *505 with the costs of providing maintenance on an annual basis, the initial cost of the rotable parts in the replacement parts pool being such a cost, and because it: (2) was consistently applied by petitioner since 1957, (3) was required by respondent for many years, including the years at issue, (4) was adopted and used in accordance with accepted practices in the computer industry and (5) conformed to GAAP. In support of its position, petitioner presented the expert report and testimony of James E. Wheeler (Wheeler) and Irving H. Plotkin (Plotkin). Wheeler was recognized as an expert in matters of financial accounting. Wheeler concluded that petitioner's method of accounting for its rotable parts in its replacement parts pool was correct and in accord with GAAP. Petitioner's rotable parts were not "inventory" as that term is defined for purposes of GAAP because such parts: (1) Were used in petitioner's maintenance service business and were not held for sale and (2) were not consumed in the production of goods and services and thus were not supplies. Also, unlike items of inventory in most instances, the parts were subject to repair expense. Wheeler testified that, for financial *506 accounting purposes, petitioner's method of depreciating the costs of the rotable parts in its replacement parts pool was proper because it took into account the nature and classification of the asset and appropriately considered: (1) That the costs of the parts did not enter as a lump sum into the computation of the cost of the maintenance services rendered; (2) that the rotable parts did not expire when used; (3) that the costs of the parts benefited more than one period; and (4) that the useful life of the parts was equal to that of the machines with which they were associated. Wheeler also concluded that petitioner's method of accounting clearly reflected income because it matched the revenue derived from the maintenance agreements with the costs of the rotable parts in the replacement parts pool. Plotkin was recognized as an expert in economics with special emphasis in matters regarding finance and financial accounting. From an accounting point of view, Plotkin also concluded that petitioner's fixed asset method of accounting was the proper method for treating the costs incurred in creating and maintaining the replacement parts pool because it associated those costs with the *507 revenue that petitioner received from the maintenance agreements. From an economic point of view, Plotkin concluded that respondent's proposed inventory method fails to recognize that the pool of replacement parts (and the rotable parts therein) was an asset that petitioner was required to have at its disposal as of the time that petitioner entered into its maintenance agreements with customers. Also, income would not be charged with the costs of the rotable parts in the replacement parts pool until the rotable part was destroyed or scrapped. Respondent's position is that petitioner's method of accounting did not clearly reflect income because it: did not reflect the diminution of the replacement parts pool by the removal of the rotable parts which were installed in customers' computers or reflect the value of the rotable parts which petitioner obtained from its customers' computers and added to the replacement parts pool. * * * Respondent contends that petitioner is required to treat as inventory rotable parts in its replacement parts pool because the customer acquired title to the rotable parts that petitioner placed in a customer's computer at the time of the repair and *508 because "the sales of said parts are income producing events." Respondent also contends that, even if petitioner was not required to treat as inventory rotable parts, petitioner's method still does not clearly reflect income because it fails properly to match the costs and revenue of petitioner's maintenance business and to account for rotable parts that petitioner removed from its customers' computers and returned to its pool of rotable parts. In support of that position, respondent presented the expert report and testimony of W. Eugene Seago (Seago), who was recognized as an expert in financial accounting. Seago concluded that petitioner's rotable parts in its replacement parts pool were inventory as defined for purposes of GAAP since they were "sold to customers under contract on an 'as needed' basis" and that GAAP would therefore preclude petitioner from treating them as depreciable property. Seago also concluded that petitioner's method of accounting resulted in a mismatching of revenue and the costs of generating the revenue because "The amount of depreciation (and thus the net profit) will be dependent upon how many units are transferred into the service division, rather *509 than the actual cost of parts used to meet petitioner's obligation to provide the equipment." Finally, Seago concluded that petitioner's method failed to account for the rotable parts that petitioner received from its customers. Respondent also presented in rebuttal to the reports and testimony of Wheeler and Plotkin the expert report and testimony of Richard W. Parks (Parks), who was recognized as an expert in financial economic matters. Parks' testimony related primarily to the value to be assigned to rotable parts that petitioner removed from its customers' computers in the event that petitioner was required to treat as inventory its pool of rotable parts. Discussion
The parties' conflicting positions in this case result predominantly from their respective characterizations of the nature of the transaction in which petitioner placed rotable parts from its pool in a customer-owned computer and replaced the parts removed from the pool with the parts removed from the computer. As respondent summarizes, "Petitioner views this transaction as solely the rendering of a service by petitioner, while respondent believes that the transaction is best described as a mixture of rendering *510 service and selling parts." Section 1.471-1, Income Tax Regs., provides in part: Need for inventories. -- In order to reflect taxable income correctly, inventories at the beginning and end of each taxable year are necessary in every case in which the production, purchase, or sale of merchandise is an income-producing factor. * * * Therefore, if petitioner's activities fall within the meaning of that regulation, petitioner would be required to treat as inventory its rotable parts that were placed in customer-owned computers and would not be allowed to depreciate the cost of the pool of rotable parts. See Valmont Industries, Inc. v. Commissioner, 73 T.C. 1059, 1080-1081 (1980); sec. 1.167(a)-2, Income Tax Regs. If, however, we determine that petitioner was not required to treat those parts as inventory, we must then determine whether petitioner's method of accounting clearly reflects income within the meaning of section 446. Petitioner was required to treat as inventory the rotable parts placed in customer-owned computers only if those parts were "merchandise" that was sold and if the sale of such parts was an "income-producing factor". Wilkinson-Beane, Inc. v. Commissioner, 420 F.2d 352, 355 (1st Cir. 1970), *511 affg. T.C. Memo. 1969-79. The rotable parts were merchandise within the meaning of section 1.471-1, Income Tax Regs., if they were acquired and "held for sale". Id. at 354-355; see Illinois Cereal Mills, Inc. v. Commissioner, T.C. Memo. 1983-469, affd. 789 F.2d 1234 (7th Cir. 1986). In order to make these determinations, we must take into account the particular facts and circumstances of the taxpayer in each case and the manner and context in which the taxpayer operates the business at hand. See Surtronics, Inc. v. Commissioner, T.C. Memo. 1985-277; Wilkinson-Beane, Inc. v. Commissioner, T.C. Memo. 1969-79, affd. 420 F.2d 352 (1st Cir. 1970). To have been acquired and held for sale, petitioner must have intended that they be sold. See Smith Leasing Co. v. Commissioner, 43 T.C. 37, 40 (1964). Respondent correctly cites Knight-Ridder Newspapers, Inc. v. United States, 743 F.2d 781 (11th Cir. 1984); Wilkinson-Beane, Inc. v. Commissioner, supra; Surtronics, Inc. v. Commissioner, supra; *512 and Fred H. McGrath & Son, Inc. v. United States, 549 F. Supp. 491 (S.D.N.Y. 1982), for the proposition that section 1.471-1, Income Tax Regs., is not inapplicable merely because petitioner provided both goods and services to its customers. In Wilkinson-Beane, Inc., the taxpayer provided complete funeral services for which it charged a single price. A complete funeral service included providing a casket that was selected by the deceased's family. The individual items included in the service were not separately identified in the billing. Finer and more expensive caskets were the means by which customers were induced to pay greater fees for a complete funeral service and "the particular type of casket primarily determined the price" of the service. The price charged for the service thus bore a direct relationship to the magnificence of the casket chosen. We thus concluded that the caskets were, "in effect, sold as a type of merchandise" and were therefore merchandise within the meaning of section 1.471-1, Income Tax Regs. We also concluded that, under those circumstances and given that the costs of the caskets purchased were between 13.6 percent and 15.4 *513 percent of receipts for the years in issue, the caskets were income-producing factors. Relying on Wilkinson-Beane, Inc. v. Commissioner, supra, the Court of Appeals for the Eleventh Circuit similarly concluded in Knight-Ridder Newspapers, Inc. v. United States, supra, that the taxpayer was required to treat as inventory newspapers that it sold. The Court of Appeals held that the sale of newspapers was an income-producing factor within the meaning of section 1.471-1, Income Tax Regs., where the cost of raw materials for the newspapers and the actual sales price of the newspapers were 17.6 percent and 20 percent of revenue, respectively. Id. at 790. Respondent therefore argues that, because the cost of petitioner's rotable parts in this case represented approximately 12 percent and 11 percent of the revenue from the maintenance agreements during 1980 and 1981, respectively, and because the cost of the rotable parts to be utilized was considered in determining the amount of the fee to be charged under the maintenance agreements, "it is clear that the sale of the rotable parts was an income producing factor and that, consequently, *514 the inventory method of accounting must be employed to clearly reflect income." Whether petitioner's rotable parts were acquired and held for sale is inherently a factual question and must be decided after taking into account all of the surrounding facts and circumstances. In Wilkinson-Beane, Inc. v. Commissioner, supra, we concluded that the taxpayer's caskets that it provided to its customers as part of the complete funeral services were, "in effect," sold as a type of merchandise because the price charged for the service was directly related to, and "primarily determined" by, the type of casket chosen. Similarly, we concluded in Surtronics, Inc. v. Commissioner, supra, that it was "apparent" that the taxpayer sold to its customers metals that it used in its service business because the amount that the customer paid was based upon, and determined solely by reference to, the approximate cost of the metal used. In this case, petitioner was obligated under the terms of its maintenance agreements to provide labor and materials that were necessary to repair its customers' computers. The fee that petitioner charged was a fixed amount, and petitioner *515 installed parts from its replacement parts pool in a customer's computers at no additional charge to the customer. The number of parts that petitioner actually used to repair a specific computer and petitioner's actual cost to comply with the terms of the maintenance agreement did not change the amount of the fee that petitioner charged to that customer. Moreover, the fee was the same regardless of whether the computer was leased or sold. Thus, in contrast to the facts in Wilkinson-Beane, Inc. v. Commissioner, supra, and Surtronics, Inc. v. Commissioner, supra, there was no direct relationship between the amount of the fixed fee that petitioner charged to maintain the computers and the price or cost of the rotable parts in petitioner's replacement parts pool. Also, the price charged for the complete "service" in those cases could be determined only after the particular product had been selected by the customer, whereas the fixed maintenance fee that petitioner charged was established prior to the time when petitioner was able to determine the particular type or types of parts that would be used or even the extent to which such part or parts would *516 be used. Also, that the cost of the rotable parts to be utilized in petitioner's maintenance service business was "considered" in determining the amount of the fixed fee that petitioner charged does not establish that those parts were acquired and held for sale, just as the failure to list separately the price for each product in Wilkinson-Beane, Inc. v. Commissioner, supra, and Surtronics, Inc. v. Commissioner, supra, did not establish that such products were not acquired and held for sale or that they were not an income-producing factor. In those cases, the costs of the products were included in the price charged for the service, and we therefore held that the products were income-producing factors. The consideration of such costs, however, should not control the classification of the products as depreciable property or inventory for Federal income tax purposes, and the cases cited and discussed above do not so hold. Respondent also argues that rotable parts in petitioner's replacement parts pool that were placed in customer-owned computers were inventory that was sold because title thereto passed to the customers at that time. Petitioner argues *517 that the transfer of title to such customers should not control the treatment in circumstances such as those in this case. The passing of legal title is among the factors to be considered in determining whether a sale has occurred for Federal income tax purposes. Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981). Because it is only one factor, however, it is not determinative. See, e.g., Paccar, Inc. v. Commissioner, 85 T.C. 754 (1985), affd. 849 F.2d 393 (9th Cir. 1988). Rather, the determination of whether a sale has occurred is to be governed by the substance of the transaction and not its form. Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978). In our view, respondent's focus on title in this case elevates form over substance. Respondent determined in the notice of deficiency that petitioner was required to treat as inventory only those rotable parts in the replacement parts pool that were used to service customer-owned computers. But, if those same parts in that pool were used to service computers that petitioner leased to its customers, petitioner was allowed to capitalize *518 and depreciate those costs. Those parts, however, were not physically segregated, and the amount of the fixed fee that petitioner set forth in its maintenance agreements was the same whether petitioner agreed to service a leased or a customer-owned computer. The proposed disparate treatment for the rotable parts installed in customer-owned computers results solely from respondent's focus on title and disregards the purpose for which the property was acquired and held, which is determinative of whether property is merchandise within the meaning of section 1.471-1, Income Tax Regs. See Wilkinson-Beane, Inc. v. Commissioner, 420 F.2d at 354-355; Illinois Cereal Mills, Inc. v. Commissioner, T.C. Memo. 1983-469, affd. 789 F.2d 1234 (7th Cir. 1986). Petitioner acquired a pool of rotable parts at the time that it introduced a new computer model and related equipment. The number of parts in the pool that petitioner acquired was that which petitioner anticipated would be necessary to satisfy its obligation to service and repair a computer that it sold or leased to its customer and to provide at no additional charge the parts that *519 were necessary to effect the repair. When petitioner removed a part from a computer and replaced it with a part from its replacement parts pool, it retained the title and the right to possess the part that was removed. If the part that was removed was an expendable part, it was discarded. Petitioner did not capitalize and depreciate the cost of those parts because those parts could not be used again in petitioner's maintenance service business. If the part that was removed was a rotable part, however, it could be used again in petitioner's maintenance service business. Approximately 20 to 30 percent of the rotable parts that petitioner removed from a customer's computer were operational and were therefore returned to the replacement parts pool. Defective rotable parts were repaired and returned to the replacement parts pool and thereafter were also available for use in petitioner's maintenance service business. Moreover, petitioner used the rotable parts for purposes other than replacing defective parts. Petitioner's field engineers used parts from the replacement parts pool as diagnostic tools to isolate the problem in a computer. In that context, the field engineer would *520 place various parts into the customer's computer until the engineer was able to locate the defective part or parts. Parts that were so used were returned to the replacement parts pool as operational parts after the service call. Although we are generally constrained to base our analysis and conclusions on what petitioner actually did and not on what it might have done, it is appropriate in this case to look to the latter to determine if there is a substantive difference between the two. Also, how the parties viewed the transaction is a consideration in determining whether the transaction is properly characterized as a sale for Federal income tax purposes. See Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981). In this respect, we note that petitioner could have returned to the customer's computer the rotable part that petitioner removed from that computer after it was determined that the part was not defective or, if defective, after it was repaired. Petitioner chose not to return the removed part because of the downtime and disruption to the customer's business that would have resulted. Also, in many instances, the customer was not aware *521 that a part had been removed from its computer and replaced with a rotable part from petitioner's replacement parts pool and the customer apparently would be indifferent as to whether the removed part would actually be returned were it not for the disruption and downtime that such a second swap would cause; the customer's concern was that its computer remained in operation. Thus, the record supports the conclusion that both petitioner and its customers viewed the transaction as involving the sale and purchase, respectively, of a service and not of a service and a product. For these reasons, we conclude that rotable parts in petitioner's replacement parts pool that were used to service customer-owned computers were not acquired and held for sale and that those parts were therefore not merchandise within the meaning of section 1.471-1, Income Tax Regs. Petitioner was therefore not required to treat such parts as inventory. We have considered the few instances in which petitioner sold parts from its replacement parts pool, but we are not persuaded that they compel a contrary conclusion. Because petitioner was not required to treat as inventory its pool of rotable parts, we now must *522 consider whether petitioner's method of accounting clearly reflects income within the meaning of section 446 and the regulations thereunder. Although useful to a limited extent, we decline to discuss in depth the parties' comparisons in their briefs of their respective methods, inasmuch as our role is not to weigh and determine the relative merits of systems of accounting. United States v. Catto, 384 U.S. 102, 114 (1966). Rather, as set forth above, petitioner's accounting method clearly reflects income if it results in accurately reported taxable income. Wilkinson-Beane, Inc. v. Commissioner, 420 F.2d 352, 354 (1st Cir. 1970), affg. T.C. Memo. 1969-79. A factor to be considered in determining whether a method of accounting clearly reflects income is that revenue must be matched with costs associated with earning that revenue. We have already concluded that petitioner was in the business of selling its repair services. In the course of that business, petitioner entered into maintenance service agreements with its customers. Petitioner's obligation under the terms of those agreements was to repair and maintain its customers' *523 computers, including providing any necessary parts at no additional charge to the customer. In our view, the record supports petitioner's contention that it was required to establish a pool of rotable parts prior to the time that it entered into maintenance agreements to satisfy its obligations thereunder. Petitioner was also required to maintain the necessary parts in such a pool over the lives of the computers covered by petitioner's maintenance agreements, regardless of actual use of those parts. In this regard, we agree with petitioner that the acquisition and maintenance of a pool of rotable parts were similar to the acquisition and maintenance of any other capital asset used in a trade or business within the meaning of section 167. The fixed fee that petitioner earned from its maintenance agreements was dependent on, among other things, the availability of a pool of rotable parts that could be used to repair a customer's computer and not on petitioner's actually placing a rotable part from its pool in a customer's computer. Petitioner therefore accrued the fee over the lives of the computers covered by the agreements. Thus viewed, the costs of establishing and maintaining *524 the pool of rotable parts, which costs were necessary to earn the fixed maintenance fee, should be capitalized and depreciated over the lives of the computers with which they were associated in order that they properly be matched with the fee that petitioner earned from the maintenance agreements. Petitioner's fixed asset method of accounting for the costs of establishing and maintaining a pool of rotable parts is supported by the opinion of the Court of Claims in Transwestern Pipeline Co. v. United States, 225 Ct. Cl. 399, 639 F.2d 679 (1980). The issue in that case was whether the cost of the "line pack" in the taxpayer's pipeline system was properly capitalized and depreciated over the life of the system or was required to be treated as an inventory expense. The line pack was a volume of natural gas that must have been in the taxpayer's pipeline system prior to operation and at all times thereafter to allow the taxpayer to meet its contractual obligations to deliver to its customers an uninterrupted flow of gas. The volume of the line pack did not vary appreciably from the time it was first injected. The Court of Claims concluded that the line *525 pack was not inventory or property held primarily for sale because the constant volume of gas in the pipeline was necessary for the operation of the pipeline system and because the line pack would be lost at the end of the system's useful life as a result of the lack of any economically feasible means of recovering any significant portion of the line pack at the time that the system was abandoned. The court therefore held that the cost of the line pack constituted a capital expenditure that was depreciable over the life of the pipeline system and that that method clearly reflected the taxpayer's income. Transwestern Pipeline Co. v. United States, supra at 687-688. We reject respondent's contention that the rationale in that case is not applicable to this case because the pipeline could not physically operate without the line pack. Petitioner's pool of rotable parts, in our view, was just as indispensable to the effective operation of petitioner's business as the line pack was to the taxpayer's business in Transwestern Pipeline Co. Respondent also contends that Transwestern Pipeline Co. is distinguishable because the gas in the pipeline and the gas sold to the *526 taxpayer's customers were fungible. In that case, however, the court specifically rejected the Government's focus on the specific molecules of gas that were flowing through the pipeline to the customers at all times. Instead, the court held that the important consideration was that the volume of gas was constant. Similarly, the important consideration here is not whether each individual rotable part that was removed from the pool was fungible with each individual rotable part that was removed from the customer's computer and returned to the pool but that the volume of such parts in the pool that was necessary for the operation of petitioner's business did not vary appreciably from the time that the cost was incurred to established a pool of rotable parts for a particular computer. Again, we emphasize that it was the pool of rotable parts that was necessary for the operation of petitioner's maintenance service business. We therefore reject respondent's argument that petitioner's method of accounting does not clearly reflect income because it does not account for each individual transfer of a rotable part in and out of the pool. Moreover, we note that petitioner's method of *527 accounting for its pool of rotable parts used to repair leased computers similarly does not take into account each individual transfer in and out of the pool notwithstanding that the parts exchanged were not fungible. Another factor to consider is whether the taxpayer's method of accounting reflects the consistent application of GAAP in a particular trade or business in accordance with accepted conditions or practices in that trade or business. Sec. 1.446-1(a)(2), Income Tax Regs. In this case, the evidence as to the "accepted conditions or practices" in petitioner's trade or business is that 7 of the top 12 companies in that industry used some form of a fixed asset method of accounting and that the remainder of such companies used some form of an inventory method of accounting. Whether petitioner's method of accounting conformed to GAAP and therefore clearly reflected income was disputed by the parties' respective experts. Petitioner's financial accounting expert, Wheeler, testified that, because the cost of the pool of rotable parts benefited more than one period and because the pool of rotable parts had a useful life equal to the equipment with which that pool was associated, *528 petitioner's method of accounting achieved the proper matching of costs with the revenue realized from its maintenance service business. Wheeler concluded that petitioner's method of accounting clearly reflects income and was consistent with GAAP. Plotkin, petitioner's other expert, who was recognized as an expert in matters regarding finance and financial accounting, likewise so concluded. Respondent's financial accounting expert, Seago, testified that, for accounting purposes, a depreciation system was appropriate where: we acquire an asset and intend to use it in the business throughout its useful life or some -- or useful life to our business. And under a fixed asset or depreciation system, we're going to use that asset in the business for a number of years, so we systematically allocate the cost to each one of the periods that benefited from that asset being around. And there you get a good matching of revenues and expenses. Now that's for an asset that you buy with the intention to use it in the business to generate other income. Seago therefore concluded that petitioner's fixed asset method of accounting for a pool of rotable parts that petitioner used to service *529 leased computers was proper and in accord with GAAP. Seago also concluded, however, that that same method of accounting for a pool of rotable parts that petitioner used to service customer-owned computers did not clearly reflect petitioner's income and was not consistent with GAAP because petitioner was "applying it to assets that are not going to be used in the business." These latter conclusions were premised on Seago's view that petitioner sold rotable parts to its customers and that petitioner's obligation under its maintenance agreements was to provide equipment; Seago was not able to articulate any other basis for concluding that petitioner's fixed asset method of accounting was in accord with GAAP in the first instance but not in the second. Moreover, it is apparent that Seago was basing his conclusions on legal and tax accounting principles and not on financial accounting principles. Therefore, because we concluded that rotable parts in petitioner's pool that petitioner used to service customer-owned computers were not acquired and held for sale and that petitioner was in the business of selling services and not of providing equipment, we cannot rely on Seago's conclusions. *530 Respondent's expert in financial economic matters, Parks, testified that the issue was primarily one of "definition and classification". We similarly cannot rely on his conclusions, however, inasmuch as they were also premised on his opinion that petitioner sold rotable parts to its customers. Beyond that, Parks did not take a positive position on whether petitioner's or respondent's method properly matched costs with revenue, and his report and testimony were not particularly helpful on this point. In contrast, the facts upon which petitioner's experts' opinions were based are consistent with the facts that we have found and with our related conclusions in this case. We therefore accept their conclusions that petitioner's method of accounting for its pool of rotable parts was consistent with GAAP and clearly reflects income. In sum, petitioner's pool of rotable parts was not held for sale and petitioner was not required to treat as inventory the individual parts therein. Petitioner's pool of rotable parts was necessary to petitioner's operation of its maintenance service business and was similar to an asset used in its trade or business within the meaning of section 167 to *531 earn revenue from its maintenance agreements. Petitioner's fixed asset method of accounting properly matched the cost of establishing the pool of rotable parts with the revenue that petitioner earned from its maintenance agreements. That method was also consistent with GAAP. We therefore conclude that petitioner's method of accounting clearly reflects income and that it was an abuse of discretion by respondent within the meaning of section 446 to require petitioner to treat as inventory its pool of rotable parts. We have carefully considered, but have determined that it is not necessary to address, the remaining arguments of the parties in light of our discussion. To reflect the foregoing, An appropriate order will be issued.